EXHIBIT TWO (2)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

V.                                                          CASE No. 8:20-cr-207-CEH-NHA

PHILLIP ROY WASSERMAN

MEMORANDUM OF LAW AND ARGUMENT IN SUPPORT OF
DEFENDANT'S RULE 33 MOTION AND
DUE PROCESS PROTECTION ACT VIOLATION

Defendant now submits to this Court case law and argument in support of the motions cited above.

Defendant states the following:

1) The FBI was brought the defendant's case by OFR Agent Howland.*

2) The FBI looked into the case, went on at least one interview and declined to be involved.

3) Howland did not know if it was "a good case".

4) Howland and IRS Case Agent Batsch knew of 1-3 above.

5) The Government knew of 1-4 above.

6) The Government never revealed this exculpatory and impeaching evidence to the Court, the defense or to the jury.

7) Howland and Batsch gave false and misleading testimony to the jury about the origin of the case never mentioning the facts cited here, in violation of Giglio, Napue, and Glossip.

8) The Government failed to correct number 7 above.

9) This evidence was sought by the defendant in pre-trial motions and vehemently opposed by the government. The motions were denied.

10) As the Court knows there were substantial other issues not disclosed

* Per Howland deposition testimony (attached) the meeting was held at the FBI office

to defendant (not the subject of this motion) but shows a pattern of severe and intentional prosecutorial misconduct.

11) Would the jury have liked to know of this factual issue? Common sense says of course.

12) Would this disclosure have affected defendant's ability to present a defense by calling FBI agents Volp and Stone? Of course.

13) Would this disclosure affected defendant's ability to confront witnesses? Of course.

14) Were defendant's 5th and 6th Amendment rights violated? The right to due process, the confrontation clause and the right to present a full defense? Yes!

15) Does the exclusion of this information meet the 4 prong requirements of Brady set out by the 11th Circuit? Yes.

16) Did the exclusion of this evidence, combined with the confrontation clause violation and right to present a full defense clause violate defendant's rights? Yes.

17) Was this exculpatory evidence? Yes

18) Was this evidence impeaching? Yes

19) Was this evidence material? Without a doubt.

20) Did the government and its agents violate the Court order of the Due Process Protection Act? Absolutely.

21) Was that violation intentional? Absolutely

22) Is there proof of the violation? Yes, Howland's own words under oath.

23) Defendant asks the Court the following - "If this material evidence wasn't important why did the government and agents fight so hard to not disclose it?"

24) Did Howland and Batsch's testimony leave the jury with a false impression? Absolutely

25) The timing of the not disclosed exculpatory evidence is relevant because it was at the very beginning of the investigation.

To establish a Brady violation, a defendant must show that "(1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002). The Supreme Court has recognized that "[i]mpeachment evidence... as well as exculpatory evidence falls within the Brady rule." United States v. Bagley, 473 U.S. 667, 675 (1985). It is well-established that a Brady violation exists where the suppressed evidence would have "the whole case in such a different light as to undermine confidence in the verdict." See Banks v. Dretke, 540 U.S. 668, 698 (2004).

Here is a direct quote from Howland's deposition:

Q..During the meeting, did Volp or Stone say that they had some interest in pursuing or getting involved in the Wasserman FastLife investigation?

A..They initially did, because I believe if I'm not mistaken, Jay Stone went on an interview with me and Shawn at some point, either, I think it was in 2019, if I'm not mistaken at some point.

An equivalent to be drawn here is that the DEA looks at drug deal, or the ATF looks at a gun deal, neither agency pursues it, and the IRS becomes the lead case agent. And the government never discloses to the defense the other agencies involvement and lack of involvement (not to mention the jurisdiction issue). The government in its response does not dispute this non-disclosure, simply argues it is being rehashed (impossible becuase of the dates of disclosure) or or it should be a 2255 (ignoring the fact that Rule 33 is for newly discovered evidence).

Where are the FBI notes?  Why did Batsch or Howland omit these important details during their testimony?  Why did the government not correct their testimony?

THE FBI JOINED IN THE INVESTIGATION OF FASTLIFE
AND DEFENDANT AND IT WAS NEVER DISCLOSED

More from Howland's sworn testimony:

Q..Did the FBI at any time following the meeting join in the investigation of FastLife and Mr. Wasserman?

A..I believe Jay Stone attended an interview with Shawn and I at some point in the investigation.

Imagine if the Government had disclosed this pre-trial (as was their obligation) and then asked the Court for a motion in Limine to prevent the defendant from presenting it to the jury?  In what universe would this happen?  Not in this Nation of Constitutional Rights.  The Constitution is a document that protects the defendant's rights.  But it was ignored in this case by the government, as was the Court Order of the Due Process Protection Act.

This is not information defendant should have gone fishing for (even though he attempted to find it and the other exculpatory information requests thru denied pre-trail motions).  It was the government obligation to disclose it without asking.

Howland's sworn testimony in his deposition: "I did not know if it was a good case."  That sure was not the impression the jury got from his wayward testimony at trial.  He acted like he had found the modern day equivalant of Al Capone in the being of the defendant.

The jury would thus have formed a "significantly different impression" of Batsch and Howland's credibility if Mr. Wasserman had not been deprived of the opportunity to introduce evidence of these important facts.  United States v. Lewis, 40 F.4th 1229, 1246 (11th Cir. 2022).

"[e]vidence is material...if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Robinson, 583 F.3d at 1270 (10th Cir. 2009) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)). "...the touchstone is simply whether the ultimate verdict is one 'worthy of confidence.'" Id. at 1270-71 (quoting United States v. Ford, 550 F.3d 975, 993 (10th Cir. 2008)(Gorsuch, J. dissenting)).

Further, the Supreme Court has recognized that a Brady violation may exist where the government fails to disclose exculpatory or impeachment evidence even if the information has not specifically been requested by the defendant if the undisclosed evidence is so significant as to deny the defendant a fair trial. Kyles, 514 U.S. at 433.

The former Fifth Circuit observed in United States v. Anderson, 574 F.2d 1347 (5th Cir. 1978) that " the prudent prosecutor will resolve doubtful questions in favor of disclosure." Id. at 1353 (citation omitted). Far from heeding this admonition, here the government chose not to disclose information it learned before trial. The Court held in Anderson "that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process." Id. at 1355 (citing Napue v. Illinois, 360 U.S. 264 (1959)). Further, "[t]he same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression." Id.(emphasis added).

This Court further stated in Boyd v. Allen, 592 F.3d 1274 (11th Cir. 2010) that "[s]ince its decision in Napue and Giglio, the Supreme Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is a reasonable likelihood

that the false testimony could have affected the judgement of the jury." Id. at 1397 (internal citations omitted).

"Due process is violated when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears. That the false testimony goes only to the credibility of a witness does not weaken this rule." United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977)(citing Napue, 360 U.S. 264; Giglio, 405 U.S. 150).

The Supreme Court has recognized that a criminal defendant has a constitutional right to "present his own witnesses to establish a defense." Washington v. Texas, 388 U.S. 14, 19 (1967). "A criminal defendant's right to present a witness in his own defense during a criminal trial lies at the core of the fifth and fourteenth amendment guarantees of due process." United States v. Rushin, 844 F.3d 933, 941 (11th Cir. 2016).

It is bedrock constitutional principle that the Sixth Amendment "guarantees the right of an accused in a criminal prosecution to be confronted with the witness against him." Davis, 415 U.S. at 315. Supreme Court "cases construing the [confrontational] clause hold that the primary interest secured by the it is the right of cross-examination." Id. "[T] right of cross-examination is an essential safeguard of factfinding accuracy in the adversary system of justice and 'the principle means by which the believability of a witness and the truth of his testimony are tested.'" Davis, 415 U.S. at 316.

A criminal defendant's constitutional right to present witnesses in support of a defense is a core due process right. Washington, 388 U.S. at 19; Rushin, 844 F.3d at 941. For instance, this Court has recognized that the exclusion of defense testimony is constitutional error when the excluded testimony would have "called into question a portion of [the government agency's] testimony 'such that a reasonable jury might receive it differently." United States v. Pemberton, 479 Fed. Appx. 264, 268 (11th Cir. 2012).

Where the exclusion of significant evidence impairs a defendant's "right to fully present their defense", reversal is required. <u>United States v. Veltmann</u>, 6 F.3d 1483, 1495 (11th Cir. 1993).

There is no disputing defendant did not get to cross-examine Howland and Batsch about the FBI involvement or present the FBI agents in his defense.  All because the Government, Batsch and Howland suppressed this exculpatory and impeaching evidence.

Imagine the surprise of the jury when they would have learned that Howland didn't know if he had "a good case" (quoting his sworn deposition testimony) and learning that the 2 FBI agents looked into the case and passed on it.  Was it because of retired FBI CPA agent Franklin Worrell's opinion that there was "no crime here" (Part of the innocence ground in the Rule 33 motion). That exculpatory information would have changed the entire cross of Batsch and Howland and since it was the embryo stage of the investigation changed the entire witness lists and defense strategy.  You can plan for what you know, not what is kept from you.

What if Rossman had never spilled the beans about his mental illness at his sentencing?  What if defendant had never been able to take Howland's deposition to learn of his duplicity?  The defendant's trial went 6½ weeks.  The government staged a personal 404B attack on defendant, yet purposely left out not just one set of exculpatory evidence but now two.

How do we explain this? Defendant doesn't blame the Court.  The Court didn't know.  But neither did the defendant or the jury.

When one looks at former AUSA Bedke's history, how she falsely ruined the lives of Baby Sabrina's parents, and now this.  Defendant believes the following: Prosecutorial misconduct is in her nature.  Look what other Judges and Magistrates have said about her.  Her actions in this case are a repeat of her bad acts done in the past, they are repeated prosecutorial misconduct and a severe abuse of

7

power.  Such behavior is incompatible with the laws of our Nation and should not be allowed to stand.  Defendant respectfully calls upon this Court to take the appropriate corrective action.

Imagine if we could call the jury back in and advise them of Howland's statements and the FBI failure to get involved in the case.  Would they want to know more?  Of course.  Would it affect their verdict?  Of course.  That is why all the case law cited here is so directly on point, especially Glossip.

what's worse is that the U.S. Attorneys office can't even own up to this.  That is why the violation of the Due Process Protection Act order is so pivotal here.  Where is the justice?  If defendant ignored a direct court order there would be severe consequences to pay.  Why does it not go both ways?  Is that fair?  Is that just?  And from the Supreme Court to the Eleventh Circuit to all the sister circuits there is case after case pointing out why this is so wrong.  Below is more.

Rimmer v. Secretary, Florida Dept. of Corrections, 876 F.3d 1039 (11th Cir. 2017) is a key case in light of defendant's facts and issues:

As recognized in Brady and its progeny. principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant.  Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97; Banks v. Dretke, 540 U.S. 668, 691, (876 F.3d 1054) 124 S.Ct. 1256, 1272, 157 L.Ed. 2d 1166 (2004). To establish a Brady violation, a defendant must prove three essential elements: (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willingly or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant. Turner v. United States, 582 U.S. 137 S.Ct. 1885, 1893, 198 L.Ed. 2d 443 (2017); Banks. 540 U.S. at691, 124 S.Ct. at 1272; Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936. 1948, 144 L.Ed. 2d 286 (1999).

In determining whether disclosure of the suppressed evidence might have produced a different result, we must consider the "totality of the circumstances." Bagley, 473 U.S. at 683. 105 S.Ct. at 3384. "We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceding would have been different.'" Turner, 582 U.S. at __, 137 S.Ct. at 1893 (citation omitted) (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed. 2d 342 (1976), and Cone v. Bell, 556 U.S. 449, 470, 129 S.Ct. 1769, 1783, 173 L.Ed. 2d 701 (2009)).

The Eleventh Circuit quotes Turner in that the context of the entire record must be used to evaluate the withheld evidence. This brings the context of the FBI evidence into the conjecture with the failure to disclose the Rossman issue. So even if this Court were to find that the failure to disclose the FBI evidence is not substantial enough to meet a new trial, there is no doubt that in the context of the entire record, and the totality of the circumstances, defendant has met his burden.

It is repetitive, but the entire government's team's behavior and obligation to duty was really bad in this case.

Defendant requests this Court look at Holberg v. Guerrero, 130 F.4th 493, (5th Cir. 2025) for several reasons.

First it has a discussion on Glossip, which applies heavily to both suppression issues, but especially Rossman. Even the Rossman issue is not the subject of this motion, the Eleventh Circuit says the suppression of evidence has to be looked at cumulatively per the cases already cited.

"Our colleague in dissent underestimates the power of an advocate armed with the evidence here illegally withheld and its impact on the trial. That fatality

is the driving force of the <u>Brady</u> doctrine itself. We highlight here <u>Glossip v.</u> <u>Oklahoma,</u> the recent decision of the Supreme Court, reversing and remanding the Oklahoma Court of Criminal Appeals' judgement and ordering a new trial for defendant Richard Glossip. 59 The Court found the jury's credibility assessment of the prosecution's star witness "necessarily determinative" and the prosecution's <u>Napue v. Illinois,</u> 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 1217 (1959), violation material-even though the jury was aware that the witness in question was untrust-worthy.60  Here, the State succeeded in blocking evidence undermining Kirkpatrick's credibility.  Given the prosecution's knowledge and nondisclosure (<u>2025 U.S. App.</u> <u>Lexis 31</u>) of Kirkpatrick's government informant status, and the deal it struck with her including a ticket to avoid jail, the prosecution had to know that there was-at best-a high risk of presenting false testimony.  We do not conflate Brady and Napue but only note that this recent ruling reinforces that the ultimate decisions in capital cases lie with the jury; practices that take the power from the jury to the prosecution are forbidden.  Brady and Napue hold hands in their efforts to protect the jury in their decision-making and to preserve the fund-amentals of a fair trial."

Next the Holberg Court finds that materiality requires only "a reasonable probability that at least one juror" would have decided differently. "The critical question to the defense here is whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  And because Holberg's conviction required a unanimous jury recommendation, materiality here requires only "a reasonable probability that at least one juror" would have decided differently.  Looking at these facts through the lens of a jury who was deprived of this information,we find that at least one juror would have done so."

If this Court looks through the lens of a jury who was deprived of all

this information, it must respectfully find that at least one juror would have decided differently in defendant's case.

The Court continues on with the role of the prosecutor, whose search for the truth in defendant's case was only obtained by omitting and hiding the truth. In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The purpose of Brady and its progeny is to ensure that "criminal trials are fair[.] and "that a miscarriage of justice does not occur." Placing the burden on prosecution to disclose information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials": a prosecutor must disclose evidence to the defense because its interest "is not that it shall win a case, but that justice shall be done."

Was the evidence of the FBI favorable and material to defendant? Of course. That's why the government did not want it in. This evidence would have strengthened defendant's defense at trial. Based on the facts and the Law the defendant did not even come close to getting a fair trial.

Favorable evidence is "evidence tending to strengthen a defense[.]" [T]he character of a piece ofevidence as favorable will often turn on the context of the existing or potential evidentiary record." Over a decade before Holberg's trial, the Supreme Court held in United States v. Bagley that favorable evidence includes impeachment evidence. Because impeachment evidence is "evidence favorable to the accused "for many years now it has been well-established federal law that impeachment evidence "falls within the Brady rule." The Supreme Court has emphatically "disavowed any difference between exculpatory and impeachment evidence for Brady purposes[.]"

As to the materiality element, "evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding (2025 U.S. App. LEXIS 15) would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." The touchstone of the materiality analysis is "a reasonable probability of a different result," such that "the government's evidentiary suppression undermines confidence in the outcome of the trial." The Brady materiality analysis is "not considered in the light of the probability of acquittal" and instead simply asks whether there is a reasonable probability that the resulting proceeding "would have been different." Materiality "is not a sufficiency of evidence test.

There are a slew of unpublished recent Eleventh Circuit cases discussing Brady. United States v. Loute, 2023 U.S. App. LEXIS 24791 (11th Cir. 2023). Under Brady, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a Brady violation warranting reversal of the conviction, s defendant must show that (1) the prosecution suppressed evidence, intentionally or inadvertently; (2) the evidence was favorable to the accused because it was either exculpatory or impeaching; and the defendant suffered prejudice[2]. To show prejudice, the defendant must establish that the suppressed evidence was material for Brady purposes-in other-words, that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

Evidence affecting the credibility of a government witness is subject to disclosure as Brady material when the witness's reliability may impact the jury's verdict. Impeachment evidence should be disclosed in time to permit defense

[2]Strickler v. Greene, 527 U.S. 263,280-82,119 S.Ct. 1936,144 L. Ed. 2d 286 (1999)

In his concurring opinion Judge Abudu held:

"Prosecutors play a special role 'in the search for truth in criminal trials.' Strickler v. Greene, 527 U.S. 263, 281, S.Ct. 1936, 144 L.Ed. 2d 286 (1999). As a result, the court, defendants, and juries expect prosecutors to refrain from using improper methods to secure a conviction. Banks v. Dretke, 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed. 2d 1156 (2004).

The Supreme Court has issued many rulings outlining a prosecutor's duties to the court, litigants, and juries. Most relevant here, prosecutors cannot suppress 'evidence favorable to an accused...where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct.1194, 10 L.Ed 2d 215 (1963). Thus, "prosecutor[s] may [not[ hide," nor must a petitioner "seek" out, the existence of Brady materials. Banks, 540 U.S. at 696.

Additionally, prosecutors have an obligation to correct false testimony once it is stated in court Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed. 1217 (1959). In fact, "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."Id. As the Supreme Court recognized, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."Id.

Defendant asks this Court to examine the following question:

In failing to disclose evidence favorable to defendant, and in their overall actions did the government in this case hold to their obligations in playing a special role "In the search for the truth?"

counsel to use it effectively in cross-examining the witness. Giglio v. United States. 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972) United States v. Jordan, 316, F.3d 1215, 1253 (11th Cir. 2003)

Interestingly enough, in Loute there was an issue of late though correct disclosure of a key government witness' "mini-stroke" that affected her memory "a little" and a disclosure of the medication she was on. This case is out of the Southern District of Florida. Obviously the U.S. Attorney there operates on a different set of rules (the correct ones) compared to the U.S. Attorneys office in Tampa.

Mills v. Commissioner, 102 F 4th 1235 (11th Cir. 2024). Chief Judge Pryor discusses fraud on the Court. Fraud on the court involves a direct assault on the integrity of the judicial process. It embraces only that species of fraud that officers of the court perpetrate against the judicial machinery and that defies the court itself. It invloves an unconscionable plan or scheme.

After the multiple fraudulent actions of the government in failing to disclose first Rossman, and now the FBI, the defendant has met his burden of showing that the government committed a serious assault on the judicial process.

Chief Judge Pryor goes on to quote Gore and Davenport Recycling Assoc.. "Fraud on the court involves a 'direct assault on the integrity of the judicial process.' Wright, Miller & Kay, Federal Practice & Procedure §2870. It 'embraces only that species of fraud' that officers of the court 'perpetrate[]' against the judicial machinery' and that 'defie[s] the court itself.' Gore, 761 F.2d at 1551 (citation and internal quotation marks omitted). It involves 'an unconscionable plan or scheme'" See Davenport Recycling Assoc. v. Comm'r. 220 F.3d 1255, 1262 (11th Cir. 2000)(citation and internal quotation marks omitted) (describing fraud on the court in the context of challenges to a decision of the Tax Court). This ruling applies directly to defendant's case. It could not be more to the point.

Defendant has shown that the evidentiary suppression, viewed cumulatively undermines confidence in his verdict. United States v. Grow, 2023 U.S. App. Lexis 2615 (11th Cir. 2023). The Court uses an interesting and applicable phrase- "viewed cumulatively": In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed 2d 215 (1963), the Supreme Court held that "the suppression by the prosection of evidence favorable to an accused...violates due process where the evidence is material to either guilt or to punishment." Id. To meet the fourth element of a Brady violation (materiality), a defendant must show that "the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009)(quotation omitted); see also Kyles v. Whitley, 514, U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995)("A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."(2023 U.S. App. Lexis 16)(quotation omitted))

The wording "viewed cumulatively", could not be more on point. The undisputed evidentiary suppression of the FBI evidence, along with the undisputed suppression of the Rossman evidentiary suppression viewed cumulatively meets that burden.

Grow also goes on to discuss Giglio. There is no doubt that Howland's testimony at the trial about the origins of the case (and also Batsch's testimony) were false. In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972), the Supreme Court held that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with" due process. Id. at 153. "Giglio error, a species of Brady error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." Stein, 846 F.3d at 1147 (quotation omitted). "Giglio also applies where the prosecutor herself made explicit factual representations to the court or implicit factual representations to the jury, knowing that those representations were

false." Id. (quotation omitted).

To prevail on a Giglio claim, a petitioner must establish that (1) the prosecutor knowingly used purjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable liklihood that the false testimony could have affected the judgement." Ford v. Hall, 546 F.3d 1326, 1331-32 (11th Cir. 2008)(cleaned up). "The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." Guzman v. Sec'y, Dep't of Corr., 663 F 3d 1336, 1348 (11th Cir. 2011) (quotation omitted).

The Prosecutor failed to prioritize the pursuits of Truth over the pursuit of a guilty verdict. In a concurring opinion by Judge Lagoa, United States v. Deblasi, 2024 U.S. App. Lexis 23582 (11th Cir, 2024), Judge Lagoa goes through the obligations of the prosecutor and government. "... the government, in this case, failed to prioritize the pursuit of truth over the pursuit of a guilty verdict." More than sixty years ago, the Supreme Court announced that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct.1194, 10 L.Ed. 2d 215 (1963). The Court has 'since held that the duty to disclose such evidence is applicable even though there has been no request by the accused...and that the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed. 2d 286 (1999)(first citing United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed. 2d 342 (1976); and then citing United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985). Indeed, "[t]he prosecutor has a duty not only to disclose such favorable evidennce but also "to learn of any favorable evidence known to others acting on the

16

government's behalf.'" Parker v. Allen, 565 F.3d. 1256, 1277 (11th cir. 2009) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555 131 L.Ed. 2d 490.(1995).

Brady is a fundamental aspect of "the special role played by the American prosecutor in the search for truth in criminal trials." Strickler, 527 U.S. at 281. Of Brady and the related Giglio. requirements, the Department of Justice handbook devotes an entire section to policies regarding disclosure "so as to ensure that trials are fair." "Dep't of Justice, Justice Manual §9-5.001 (Policy Regarding Disclosure of Exculpatory and Impeachment information). This is consistant with the Supreme Court's clear pronouncement that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair, our system of the administration of justice suffers when any accused is treated unfairly." Brady, 373 U.S. at 87. And, as the Court observed, "[a]n inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."'Id. As I expressed at oral argument, however, the government's course of conduct here suggests a win-at-all-costs approach, taken at the expense of uncovering truth-as a trial is intended to do."

This opinion and the facts of defendant's case are clear - the violation extends to the Department of Justice's Justice Manual. Judge Logoa goes on to say: "...given the choice each time,the government chose pursuit of a verdict over pursuit of truth." That's exactly what happened in defendant's case.

Even though Judge Logoa concurred in the opinion, (because the issue was one of continuance) he cites more facts and law that relate directly on point to defendant. "Here, however, the government employed a strategic move to curtail the fact-finding power of Deblasi's jury. That conduct "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile."'Brady, 373 U.S. at 88 (quoting Brady v. State, 226 Md.

422, 427, 174 A.2d 167 (1961)).

As Justice Sutherland so aptly described the job of the prosecuting attorney.

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed 1314 (1935). Channeling the same sentiment, the Justice Manual explains that "Public service is a public trust, meaning that the decisions and actions that federal employees take must be made in the best interests of the American people." Justice Manual §1-4.010 (Standards of Conduct - Introduction). I cannot say here that the government lived up to the responsibilities and obligations with which it is entrusted."

Did the government live up the responsibilities and obligations for which it was entrusted to in defendant's case? There is absolutely no doubt it did not.

Overton v. Secretary, Florida Dept. of Corrections, 2025 U.S. App Lexis 15819 (11th Cir. 2025), the Court discussed Brady and materiality and examined the trial record and evaluated the withheld evidence in the context of the entire record and the totality of the circumstances. "As recognized in Brady and its progeny, principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant." Rimmer. The Supreme Court has identified "three components of a true Brady violation: (1) "[t]he evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently, and (3) prejudice must have ensued." Strickler.

"To establish prejudice, the defendant must show that the suppressed evidence was material." Rimmer. "[F]avorable evidence is material and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles. In determining whether disclosure of the suppressed evidence might have produced a different result, we must consider the "totality of the circumstances." Rimmer. "We must examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, 582 U.S. 313, 324-25, 137 S.Ct. 1865, 198 L.Ed. 2d 443 (2017)(alteration adopted)(internal quotation marks and citation omitted).

The Court then cites United States v. Arnold, 117 F.3d. 1308 (11th Cir. 1997) United States v. Arnold, in which we held that the undisclosed impeachment evidence was material even though the witness had been impeached with other evidence. In Arnold, we reversed on direct appeal the district court's denial of the defendant's motion for a new trial where the government withheld recordings that contradicted the government's key witness' trial testimony, Arnold, 117 F.3d at 1318. In Arnold it would have "surprised the jury to learn" of the recordings contradicting the witness's trial testimony and demonstrating the government's coaching of his testimony, even though the defendants had already impeached him with evidence that he was romantically involved with the government's agent. Turner, 582 U.S. at 327.

Certainly in defendant's case at hand it would have surprised the jury to learn that Howland had not known if it was a good case and that the FBI had been involved and "they started, you know, doing other stuff" quoting Howland's deposition testimony.

The Overton holding also discussed Banks v. Dretke, 590 U.S. 688, 703 (2004), (concluding that a petitioner's Brady claim was meritorius where the state withheld the informant status of a witness who was impeached for other reasons. including that he was an informant in different cases) and Guzman (concluding that a petitioner's Giglio claim was meritorious where the state withheld that its key witness, who previously told police she had no information about the case, was paid $500 for her testimony, even though she was impeached at trial for agreeing to testify for a lesser charge in her own case and for being reimbursed for expenses during trial, among other reasons).

Defendant submits that if the jury were to be called back today and made aware of the cumulative undisclosed evidence of the Howland deposition testimony, FBI involvement and non-involvement, and the Rossman issue, surprise would not be the word. Would it affect the verdict? How could it not?

Defendant's case must be looked at by examining the entire trial record (including the Rossman deception) and the totality of the circumstances.

United States v. Gonzalez, 2024 U.S. App. Lexis 24626 (11th Cir. 2024) restates the Rule 33 requirements for a new trial. Motions based on newly discovered evidence which may be filed within three years of the return of the verdict. Fed. R. Crim. P. 33(b)(1). To merit a new trial based on newly discovevred evidence, the defendant must show that: (1) the evidence was discovered following trial, (2) the defendant exercised due care to discover the evidence, (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material and (5) the evidence is of such nature that a new trial would probably produce

21

a different result. United States v. Lee, 68 F.3d 1267, 1273 (11th Cir. 1995). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." Id. Generally, the district court should conduct an evidentiary hearing before deciding the motion. United States v. Culliver, 17 F.3d 349, 350-51 (11th Cir. 1994)

A later ruling in Gonzalez, 2025 U.S. App Lexis 13371 (11th Cir. 2025) makes two important points:

1) That the rule is that there is reasonable probability that the suppressed evidence would have changed the trial's outcome, and

2) Evidence is viewed collectively.

The Court said: "We review alleged Brady or Giglio violations de novo but review a court's denial of a motion for a new trial based on a Brady or Giglio violation for an abuse of descretion. United States v. Stein, 846 F.3d 1135, 1145 (11th Cir. 2017). A court abuses its descretion by misapplying the law or making clearly erroneous factual findings. United States v. Scrushy, 721 F.3d 1288, 1303 (11th Cir. 2013). A finding is clearly erroneous where we, after reviewing all of the evidence, are left with a firm conviction that the court made a mistake. United States v. Rodriguez-Lopez. 363 F.3d 1134, 1137 (11th Cir. 2004).

When a defendant fails to present to the district court a particular ground for a new trial in his motion, any claim of error on appeal regarding that new ground is reviewed only for plain error. United States v. Gallardo, 977 F.3d 1126, 1142 n.12 (11th Cir. 2020). "Plain error occurs if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) That seriously affected the fairness, integrity, or public reputation of judicial proceedings." United States v. Wright, 607 F.3d 708, 715 (11th Cir. 2010) (quotation marks omitted). To establish that the error affected his substantial rights, "the defendant ordinarily must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." :

2

<u>United States v. Perry</u>, 14 F.4th 1253, 1265 (11th Cir.2021)(quotation marks omitted).  A court may vacate a judgement and grant a new trial if the interest of justice so requires. <u>Fed. R. Crim. P 33(a)</u>.

Viewed collectively in defendant's case (Howland and Batsch's false testimony, the suppression of the FBI involvement, Rossman's false testimony and the suppression of his mental illness) Gonzalez is also right on point to defendant's case.

Suppression of evidence favorable to an accused and material to his guilt or to punishment violates his due process rights regardless of the good or bad faith of the government, <u>Brady</u>.  The duty to disclose evidence extends to impeachment evidence, <u>United States v. Meros</u>, 866 F.3d 1304, 1308(11th Cir. 1999).  A defendant need not show that disclosure of the suppressed evidence would have resulted in his acquittal by a preponderance of the evidence or that there was insufficient evidence to convict in light of the suppressed evidence.  <u>United States v. Scheer</u>, 168 F.3d 445, 452 (11th Cir. 1999).

<u>Reynolds v. Commissioner, Alabama Dept. of Corrections</u>, 2024 U.S. App Lexis 25262 (11th Cir. 2024) surmises <u>Brady</u> and <u>Giglio</u>.  <u>Giglio</u> and <u>Napue</u> apply in the Rule 33 motion because both Howland and Batsch gave false and misleading testimony about the origins of the investigation against defendant. <u>Glossip</u> applies.  Once again in its response to defendant's Rule 33 motion the government offers no rebuttal or proof that defendant's claims are incorrect.  Defendant has met his burden.  The government did not, nor can not, meet their's.

<u>Bell v. Attorney General, State of Florida</u>, 2024 U.S. App. Lexis 24754 (11th Cir. 2024) also addresses that the government's evidence suppressions must be viewed cumulatively.  Even though the multiple issues of Rossman's severe mental illness, psychiatric care and use of anti-psychotic medications are not the subject of these motions (as they are on direct appeal)the Eleventh Circuit law says that the exclusion of the newly discovered suppression evidence of the

FBI involvement must be viewed cumulatively with them. Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1334 (11th Cir. 2009).(quoting Bagley). "A reasonable probability of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the verdict." Id. (internal quotation marks omitted).

Phillips v. Sec'y, Florida Dept. of Corr., 2024 U.S. App. Lexis 3131 (11th Cir. 2024) lays out two categories of Brady violations. In Brady, the Supreme Court recognized that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. The Court has since clarified that a defendant need not request favorable evidence from the State to be entitled to it. See Kyles.

There are two categories of Brady violations, each with it own standard for determining whether the undisclosed evidence is material and merits a new trial." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1333 (11th Cir. 2009). The first category of violations (often referred to as Giglio violations) occurs when "the undisclosed evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false." Id. at 1334; see Giglio, 405 U.S. at 153. When a Giglio violation occurs, the defendant generally is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury." Agurs. The standard "requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." Smith, 572 F.3d at 1333 (internal quotation marks omitted). "This standard favors granting relief." Id. We have described it as "defense friendly." Ford v. Hall, 546 F.3d 1326, 1333 (11th Cir. 2008).

The second category of Brady violations (often referred to as Brady violations) occurs when "the government suppresses evidence that is favorable

to the defendant, although the evidence does not involve false testimony or false statements by the prosecution." Smith, 572 F.3d at 1334. The defendant is entitled to a new trial if he establishes that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (internal quotation marks omitted). "A reasonable probability of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilt verdict." Id. (internal quotation marks omitted).

There can be no doubt here that the false testimony of Batsch and Howland in discussing the origins of the case against defendant and omitting any mention of the FBI (uncorrected by the government) could have affected the judgement of defendent's jury. This evidence is newly discovered as stated in the Rule 33 motion that Howland didn't think defendant needed the knowledge of the FBI involvement and it hadn't been disclosed until the deposition testimony (once again after the initial appellate brief was filed.)

The entire prosecution team, AUSA Bedke, AUSA Jones, Case Agent Batsch and former OFR agent Howland all stood by and participated in a 6½ week trial, an all day evidentiary hearing, and 2 days of sentencing where defendant was lambasted over joining a dating site while his wife sat in the courtroom in front of jurors and for not paying his homeowner association fees. The US Attorney's office in Tampa still can't own up to its misconduct. If this is not a violation of the Due Process Protections Act and due process rights of defendant then nothing ever will be.

Defendant respectfully suggests that this Court give proper consideration to his pending motion as to why all these parties should not be held in contempt. We are supposed to be a Nation of Laws. Do those Laws not apply to the defendant?

In United States v. Tarantino, 2024 U.S. App. Lexis 15122 (11th Cir. 2024),

24

The Court held that false testimony is material under if there is any resonable likelihood that the false testimony could have affected the judgement of the jury. In other words, it's material unless it's harmless beyond a reasonable doubt. Applying that standard to defendant's case there is zero chance Batsch and Howland's false testimony meets the standard of harmless beyond a reasonable doubt. Thus their false testimony about the origins of the case was material.

In United States v. Esteves, 2025 U.S. App. Lexis 17189, (5th Cir. 2025), the Fifth Circuit correctly points out that the duty of disclosure extends to Law Enforcement, i.e. Howland and Batsch: The suppression prong of the Brady test "requires that the prosecution disclose evidence when it is 'of such substantial value to the defense that elementary fairness requires it to be disclosed. Floyd v. Vannoy, 894 F.3d 143, 162 (5th Cir 2018)(quoting Agurs). The duty of disclosure "exists irrespective of a request from the defense and extends to all evidence known not just to the prosecutors, but to the others acting on the government's behalf in the case, including the police." Id. at 161-62 (quotatio and citation omitted.)

The Court also quotes Agurs regarding elementary fairness in the above. Was it fair that the FBI entrance and exit from defendant's case was never diclosed? Of course not - not to defendant, the Court or the Jury who spent 6½ weeks only getting part of the story. The defendant asks, why couldn't the government just follow the rules? Is it above the Law? Why did it so obviously violate the Due Process Protections Act?

Weissman v. Clark, 2025 U.S. App. Lexis 9659, a 9th Circuit Appeals case filed April 23, 2025 reiterates that the burden is on the government to prove beyond a reasonable doubt that it's error did not contribute to the verdict obtained.

A Napue violation is the knowing presentation of false testimony by the prosecution. Napue. The first two elements of a Napue claim require "that (1)

the testimony (or evidence) was actually false, [and] (2) the prosecution knew or should have known that the testimony was actually false." Hayes v. Brown,399 F.3d 972, 984 (9th Cir. 2005)(en banc)(citation omitted). Once the first two elements are established, a new trial is warranted if the Napue violation is material, which occurs if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury. Glossip. In short, this materiality standard requires "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 627 (citation omitted).

In Johnson v. Superintendent (et al) 2025 U.S. App Lexis 18984, 3rd Circuit filed July 14, 2025, the Court held that it must consider the effect of all "wrongfully withheld evidence". Applying this ruling makes it obvious that for the Rule 33 motion andmotion for violation of the Due Process Protections Act this Court should consider in totality all the withheld evidence: the FBI investigation, the FBI not pursuing the case, Rossman's severe mental illness, Rossman's psychiatric care and his use of anti-psychotic drugs while testifying. We must consider the effect of all "wrongfully withheld evidence" whether or not that evidence is before the Court in the form of an independent claim for relief." Wearrv.v. Cain, 577 U.S. 385, 394 136 S.Ct. 1002, 194 L.Ed 2d 78 (2016); Glossip. This is because for Brady materiality, we must add up all the evidence that the government possessed yet failed to turn over. Folino, 705 F.3d at 129.

In Hampton v. Shinn, 2025 U.S. App. Lexis 16645, a 9th Circuit case filed July 8, 2025, the court points out that in Glossip the witness testimony was the only "direct evidence". Rossman's testimony was the only direct evidence of conspiracy against defendant. Although not the subject or jurisdiction of these motions, taken in the context that the entire record needs to be examined because of the non-disclosure of the FBI evidence and the need to look at the

27

totality of the circumstances it applies in that realm.

Glossip does not alter our analysis. The Court granted a new trial under Napue where the prosecution failed to correct false testimony about a star witness's treatment for bipolar disorder. Id. at 627. Central to the Court's materiality analysis was that the witness's testimony "was the only direct evidence" of the defendant's involvement in the charged murder. Id. at 628. The jury's credibility assessment was "necessarily determinative" putting aside the witness's testimony, no physical evidence or other witness tied the defendant to the crime. Id. Thus, whether the jury convicted the defendant would rise and fall on whether it believed the star witness."

A very recent Eleventh Circuit Court case and a District Court for the Middle District of Alabama, Northern Division, look to Glossip.

In Barbour v. Hamm, United States District Court for the Middle District of Alabama, Northern Division, 2025 U.S. Dist. Lexis 163496, filed August 22, 2025, quotes as follows:

In Giglio, the Supreme Court summarized the evolution of the Fourteenth Amendment's prohibition on the prosecution's presentation of false evidence:

"As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In Napue, we said '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' Id. at 268, 79 S.Ct. at 1177. Thereafter Brady held that suppression of material evidence justifies a new trial 'irrespective of the good or bad faith of the prosecution'...When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure

nondisclosure of evidence affecting credibility falls within this general rule. ' Napue, supra, at 269, 79 S.Ct. at 1177. We do not, however automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...United States v. Keogh, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under Brady, supra, at 87, 83 S.Ct. at 1196, 10 L.Ed. 2d 215. A new trial is required if 'the false testimony could ...in any reasonable likelihood have affected the judgement of the jury...Napue, supra, at 271, 79 S.Ct. at 1178.405 U.S. at 153-54 (some citations omitted). To establish a Giglio violation under Napue's principles, a habeas petitioner must prove that the prosecution knowingly used false evidence or "knowingly allowed it 'to go uncorrected when it appear[ed]'" and that such use was material, i.e. that the false evidence "may have had an effect on the outcome of the trial." Glossip.(quoting Napue, 360 U.S. at 269, 272); see also Guzman (quoting Ford v. Hall). "[T]his materiality standard requires 'the beneficiary of [the] const-itutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Glossip.(quoting Bagley ). This materiality standard "is more defense-friendly' than Brady's." Guzman (quoting Hammond v. Hall).

The burden is on the government to prove beyond a reasonable doubt that the error omitting the exculpatory evidence of the FBI did not contribute to the verdict obtained against defendant. When this is combined with the Law that the materiality of withheld evidence must be considered collectively and in the context of the entire record (which includes the Rossman suppression), this is a standard that is impossible for the government to meet; especially when the government's actions are intentional.

Whitton v. Sec'y, Florida Dept. of Corr., 2025 U.S. App Lexis 10877 was

decided by the Eleventh Circuit on May 6, 2025 in an unpublished opinion. "We impute state agents' actual knowledge to the prosecutor because 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. Kyles.' So we deem a prosecutor's 'constructive knowledge' to be as extensive as any actual knowledge a prosecutor would have acquired had she adequately performed her relevant duties, see Robinson (describing the 'duty to learn' as 'constructive knowledge') United States v. Avellino, 136 F.3d 249, 255 (2nd Cir. 1998)(same), such as studying all relevant case files, see Glossip, (explaining 'the prosecution knew Sneed's statements were false as he testified to them' in part because the 'prosecution almost certainly had access to Sneed's medical file' which would have disproved his testimony."

There is no doubt here the state agent Howland had knowledge of the withheld exculpatory evidence. He testified to such under oath at his deposition. It is beyond reason to think that the prosecution wasn't aware of it, which is why she fought so hard against defendant's pre-trial motions. But it doesn't matter. Under the Law Howland's knowledge (and Batsch) is imputed to the prosecutor.

Defendant respectfully asks the Court, would the Court have condoned these actions by the Government had the Court known in advance of trial of them? Of course not. The burden defendant has met is undisputable. The Government and its agents' violation of defendant's constitutional rights is indisputable. The real question is why the U.S. Attorney's office in Tampa can't own up to it? Maybe it never will until the Court holds its feet to the fire.

The law is clear that the materiality of withheld evidence must be considered collectively not item by item. Evidence is considered material if "there is 'any reasonable likelihood it could have' affected the judgement of the jury" Wearry v. Cain, (quoting Giglio, 405 U.S. at 154). To prevail on a Brady claim, a petitioner "need not show that he 'more likely than not' would have been

29

acquitted had the new evidence been admitted", but instead "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." Id. (quoting Smith v. Cain. "evidence can be material even if it 'goes to the credibility of the witness'" Glossip. Moreover, "the materiality of withheld evidence must be 'considered collectively, not item by item.'" Dennis v. Sec'y Pa Gep't of Corr., 834 F.3d 263, 312 (3rd Cir. 2016)(quoting Kyles)

The Supreme Court "has made clear that claims that the prosecution know-ingly used false evidence to obtain a conviction are subject to a more lenient materiality standard not just because (they) involve prosecutorial misconduct but more importantly because they involve a 'corruption of the truth seeking function of the trial process.'" Agurs.

The Supreme Court has held that prosecutorial misconduct may "so infect the trial with unfairness as to make the conviction a denial of due process'" Darden,477 U.S. at 181 (quoting Donnelly 416 U.S. at 643). This standard "is a very general one, leaving couts 'more leeway...in reaching outcomes in case-by-case determinations.'" Parker v. Matthews. 567 U.S. 37, 48, 132 S.Ct. 2146, 183 L.Ed. 2d 32 (2012)(per curiam)(citation omitted).

Obviously and not surprisingly, the Government's collective misconduct affects defendant's pleading in an emotional way. For a non-emotional look at how a sister circuit treats egregious police and prosecutorial misconduct this Court should look to United States v. Garrett, 2025 U.S. App. Lexis 14630 (4th Cir. 2025). Though the facts of the case are not similar the holdings are highly relevant. It also raises an interesting question. What if defendant had pled guilty without knowing of the FBI situation and Rossman's mental disorder? How many other defendants has this happened to?

The United States District Court for the Eastern District of North Carolina initially denied Garrett's co-defendant's suppression motion. Garrett withdrew

his own motion, fearing it would be risky to proceed, and accepted a plea deal. After his sentencing, Garrett learned from a Government disclosure that multiple confidential informants were used, and one was compensated, which had not been disclosed earlier. This led to his appeal, arguing that the new information would have influenced his decision to plead guilty.

The United States Court of Appeals for the Fourth Circuit reviewed the case and found that the newly discovered information about the informants and the misidentification issue constituted egregious police and prosecutorial misconduct. The court held that a reasonable defendnat in Garrett's position would not have pled guilty if aware of all the relevant information. The court determined that the misconduct affected the integrity of the prosecution and Garrett's ability to make an informed plea. Consequently, the Fourth Circuit vacated Garrett's guilty plea and remanded the case for further proceedings.

The collective conduct here affects the integrity and reputation of judicial procedings at every level. The police misconduct in misidentifying Garrett and omitting key facts from warrant applications, combined with the prosecution's misrepresentations about the confidential informants, amounted to egregious misconduct that struck at the heart of the prosecutor's case and deprived Garrett of understanding the true case against him.

Even if nondisclosure is not a Brady violation, it may be argued that it made it impossible for the defendant to enter a knowing and intelligent plea. Abusive prosecutorial discovery tactics may render a guilty plea involuntary, even if not amounting to a Brady violation, when the prosecutions actions amount to deceit or lack of candor that materiality affects the defendant's understanding of the case. Even the slightest accommodation of deceit or lack of candor in any material respect quickly erodes the validity of the judicial process.

"It is appropriate to remind counsel that they have a 'continuing duty to

31

inform the Court of any development which may conceivably affect the outcome of the litigation'" Bd. of License Comm'rs of Town of Tiverton v. Pastore, 469 U.S. 238, 240, 105 S.Ct. 685, 83 L.Ed. 2d 618 (1995)(quoting Fusari v. Steinberg, 419 U.S. 379, 391, 95 S.Ct. 533, 42 L.Ed. 2d 521 (1975)(Burger, C.J. concurring) (internal quotation marks omitted). The Fourth Circuit has espoused its "confiden[ce] that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court" Shaffer Equipment Co., 11 F.3d at 457.

These inattentive mistakes appear to stem from a troubling practice in this United States Attorney's Office. See United States v. George, 95 F.4th 200, 212 (4th Cir. 2024)(Thacker, J., concurring).("[T]his court has previously questioned this particular United States Attorney's Office commitment to constitutional and unabusive discovery practices."); United States v. Bartko, 728 F.3d 327, 341 (4th Cir. 2013)(discussing three cases where the United States Attonrey's Office in the Eastern District of North Carolina's representation "involved discovery abuse by government counsel in this district"). "Mistakes happen....Nevertheless, the frequency of the 'flubs' commited by this office raises questions regarding whether the errors are fairly characterized as unintentional." Bartko, 728 F.3d at 341.

Defendant submits the misconduct in his case is more egregious.

Howland's deposition testimony directly contradicts his and Batsch's testimony at trial. Rossman was the sole witness to the conspiracy, and the issue of suppressed evidence about him must be looked at on the context of the entire record. Rimmer, Id. Here is a partial list:

1) The FBI was involved in the case against defendant - undisputed. The initial meeting where Howland tried to bring the FBI in was at the FBI office and Batsch was present.

2) The FBI didn't pursue the case - undisputed.

3) This was exculpatory and impeachment evidence and a violation of defendant's 5th and 6th Amendment rights.

4) The Due Process' Protection Act was violated by the government.

5) The evidence of #1 and #2 above were withheld intentionally to defendant, the Court, and the Jury.

6) In looking at the total context of the record the issue of Rossman's severe mental illness, psychiatric care and use of anti-psychotic medications were intentionally not disclosed to the jury, the Court and defendant.

7) In looking at the total context of the record defendant was deprived of due process, his right of confrontation to confront Batsch and Howland over the FBI, his right to present a full defense and subject to severe prosecutorial misconduct.

8) The jury was not allowed to properly assess the credibility of the sole co-conspirator, Rossman, the case agent Batsch, and Howland.

9) In the context of the entire record the actions of the FBI explain the lack of jurisdictional authority of the IRS to investigate investor fraud and the IRS lack of authority to obtain the email search warrant.

10) Not only did the government violate the Due Process Protections Act and DOJ Manual, it and they perpetrated a fraud upon the Court.

11) In doing so (number 10 above) the government showed great disrespect to the jury, the process of justice, and the Court.

12) While in jurisdiction around the country the Government acknowledges its obligation to disclose exculpatory evidence, the Tampa office of the U.S. Attorney continues to ignore and violate its obligation and duty.

13) This Court now has the facts and the Law. The defendant's Rule 33 and motion for violation of the Due Process Protection Act and Contempt should

3

be granted. With this record of withheld exculpatory and impeachment evidence it is impossible to have confidence in the verdict against defendant.

### SUMMATION

Based on the Law cited above the Court has to consider the withheld evidence, the entire trial record and context, and the totality of the circumstances.

The withheld FBI evidence is undisputed. It is exculpatory and impeaching. It explains why, the IRS took over a case and obtained an email warrant it had no jurisdiction law enforcement powers for. But in accessing the intentional withheld evidence of the FBI involvement with the totality of the circumstances (the Rossman severe mental illness, psychiatric care and anti-psychotic medication) it is clear that there is no issue that the government can prove beyond a reasonable doubt this did not affect the jury verdict.

This case is a total affront to the Due Process Violations Act order, the justice department guidelines and the Court. The Honorable action would be for the U.S. Attorneys Office in Tampa to agree and join defendant in this motion. But there has been no honor in its actions, only failure. Fortunately other government entities, like Glossip, have much more integrity.

The Government's dishonor affects the defendant severely. But if this Court doesn't make an example of this case, what's worse in the next defendants who follow. There has been a grave injustice here. Will this Court correct it?

The initial meeting where Howland tried to bring the FBI in was held at the FBI office (Batsch was present). Defendant requotes Howland "No, I don't think he needed to have knowledge"

The interest of justice requires this Court to vacate and dismiss with prejudice the judgement, and order defendant's immediate release.

26

Date: __10 / 9 / 25__

Respectfully submitted

*Phillip Ray Wallace*

Attachment

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

------------------------------------------------------------------------------------------------

FROM: Kent, Robert
TO: 73653018
SUBJECT: Depo Testimony of Howland re FBI
DATE: 10/08/2025 11:51:03 AM

I hope this is what you are requesting.  This may take multiple messages.
page 67

MR. KENT: Does everybody agree we can attach this as an exhibit?

MR. SCHULTZ: No objection.

MR. WEISBERG: No objection.

MR. KENT: So I don't need to spend more time with it right now as long as we have it as an exhibit. As I said, I'm going to mark it as Number 12, so that the numberings that I have on any other exhibits don't have to be changed. Unless anybody else wants to keep it up there for a moment, you can take it down, Andrew. Thank you for that.

Q. Mr. Howland, getting back to this round table, you were there, you said Mr. Batsch was there; how many total people were at this round table?

A. I mean, it was just a loose meeting we had on a different case, and probably like three, total. Not including myself, so four total.

Q. Some of the people there were FBI agents?

A. Correct.

Q. And then the general purpose of this meeting to start with pertained to your other case?

A. Correct.

Q. And you were the one who brought up the FastLife Wasserman situation?

A. Correct.

Q. Do you remember the names of the FBI agents who were there?

A. I believe it was Jay Stone and Rick Volp.

Q. What was the last name?

A. Volp, V-o-l-p.

Q. Do you remember the first name?

A. Rick.

Q. And other than the prior unidentified case, have you worked with these FBI agents on other matters?

A. Are you excluding that unidentified case? No, that was the only time I ever worked with them I think.

Q. Now, did you disclose this round table meeting to Mr. Wasserman at any point including during the trial?

A. No.

Q. Do you have any reason to believe Mr. Wasserman had knowledge of this round table meaning before today?

A. I don't know. It was just a loose -- it was a gathering.

Q. Yes or no, really.

A. Okay. Repeat the question.

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. Do you have any reason to believe Mr. Wasserman had knowledge of this round table meeting prior to him hearing about it today?

A. No, I don't think he needed to have  knowledge.

Q. Sir, just --

A. I need to explain my answer.

Q. If I ask you a question that asks for an explanation.

A. I don't think that's how it works.

Q. Actually, it does.

MR. SCHULTZ: Mr. Howland, if you feel you need to explain, I'll have a turn to ask you some questions and we can get into it then. Please just answer Bob's questions to the best of your ability at this point, okay?

THE WITNESS: Yeah.

MR. SCHULTZ: Thank you.

Q. So your answer was, you don't believe he knew about this meeting before today?

A. No, it wasn't a meeting about Mr. Wasserman.

Q. Well, it became a meeting about him, didn't it?

A. No, it did not, it became a discussion of

Page 69

all cases that all the agents had, and seeing who, you know, different ideas and stuff like that. It's --

Q. Right, but even though he was not the purpose of the meeting when it was arranged, he was discussed, you said that already?

A. Yeah, it was just a loose meeting, a loose talking.

Q. I'm not concerned if it was loose or not loose, his name and FastLife's name were part of the round table?

A. Correct. Yeah, it wasn't about him, but, yes, correct.

Q. Well, it was, you brought his name up?

A. The purpose of the meeting was not about him.

Q. I'm not asking the purpose.

A. It was discussed, yes.

Q. How long is your best estimate of the discussion pertaining to Mr. Wasserman and FastLife?

A. Less than five minutes.

Q. And what did you say about the status of your involvement? Let me correct it. At the time of the round table meeting, your investigation of the FastLife Wasserman

situation had been going on four to six months, correct?

A. Yeah, I guess, a guesstimate, yes.

Q. You started in July, 2018 and you said this round table meeting was late 2018, correct?

A. Correct, yep.

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. So as of the time of the round table meeting, have you interviewed any witnesses?

A. I believe so, yes.

Q. Do you know how many witnesses you interviewed?

A. Probably four, maybe; three to four, four.

Q. I know it's -- I guess about six years ago now; do you know the names of the witnesses you had interviewed as of the date of the round table meeting?

A. At the end of 2024 and 2018, I had interviewed Jerry Houchens, Joyce Knapp, Rick Figlio, and I think Ron Cassanova, if I'm not mistaken.

Q. Okay. So you're saying that -- well, let me ask you this. How long was the entire round table meeting?

A. I mean, I don't remember exactly. It was on a different case.

Q. I understand it probably initiated on

Page 71

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

FROM: Kent, Robert
TO: 73653018
SUBJECT: Howland Depo (Part 2)
DATE: 10/08/2025 11:51:03 AM

another case, but just your best estimate, was it one hour, two hours?

A. Probably like a half a day.

Q. And was this in person somewhere?

A. Yeah, we had multiple in person meetings in Sarasota at the FBI's office in Sarasota.

Q. Where was this meeting?

A. At the FBI office, I believe. We had meetings for that case specifically in the beginning of it, yes.

Q. In Sarasota?

A. Yes.

Q.. Were Agent Stone based in the Sarasota office?

A. Yes.

Q. All right. Now, maybe I misinterpreted your testimony, but in addition to the unidentified case, I'll call it, that was maybe the catalyst for this meeting, and Wasserman FastLife investigation, I think you said there were other cases that were also involved and discussed that --

A. Yeah, probably, I mean, that's what agents do. That's what we did. We talked about other cases.

Q. Do you know how many other cases were --

A. Not that I recall, no..

Q. So what was your purpose in bringing up the Wasserman FastLife matter at this round table meeting?

A. Because I had large tax liens, large civil judgments, I had investors, I had a lot of money going to personal -- it looked like personal expenses, him, personally, other people in the Sarasota area.

Q. So based on that, did you believe this is a matter the FBI might be interested in?

A. A matter of FBI, a matter with the IRS with the tax liens.

Q. So were you trying, when you brought this up at the round table meeting to get the FBI involved in the investigation?

A. Yes, and the IRS, anybody in the federal system, yes.

Q. Was there somebody from the IRS at the meeting?

A. Yeah, I told you that.

Q. Who was that?

A. Shawn.

Q. He was from the IRS?

A. Yes.

Page 73

Q. So after this meeting -- strike that.

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

Q. During the meeting, did Agents Volp or Stone say that they had some interest in pursuing or getting involved in the Wasserman FastLife investigation?

A. They initially did, because I believe if I'm not mistaken, Jay Stone went on an interview with me and Shawn at some point, either, I think it was in 2019, if I'm not mistaken at some point.

Q. What about at the meeting?

A. Well, I don't remember what the outcome of that was. They didn't -- they started, you know, doing other stuff.

Q. So is it fair to say they didn't say during the round table meeting, five minutes were devoted approximately to the Wasserman FastLife; no statements from Agent Stone or Volp that they were specifically interested in becoming involved in that investigation; is that fair?

A. I don't recall. I mean, Shawn worked out of the FBI office at that time.

Q. You don't recall Agents Volp or Stone saying anything to indicate that they were interested?

A. They might have, I don't recall.

Q. What about Agent Batsch, did he say anything at the meeting when you were all gathered?

A. I don't recall. I don't recall specifics of the meeting other than we talked about other cases as like a task force meeting.

Q. Did the FBI at any time following the meeting join in the investigation of FastLife and Mr. Wasserman?

A. I believe Jay Stone attended an interview with Shawn and I at some point in the investigation.

Q. Do you recall who that interview was of?

A. I think it was Mary Mertz (ph).

Q. And do you know why he attended? Strike that.

Did you invite him to the interview?

A. I don't recall -- I don't think I would have invited him, Shawn might have, but I'm not sure, but he was there with us.

Q. Mr. Batsch at that interview?

A. Yes, yeah, that's Shawn.

Q. Any other interviews that you conducted or participated in in which any FBI agent attended?

A. No, I think that was the only one.

Q. And do you know of your own personal knowledge, any other action that the FBI took that would have been part of the investigation of FastLife and Mr. Wasserman?

MR. WEISBERG: Object to form.

MR. SCHULTZ: Yeah, I'm going to going to object. We're getting into the law enforcement privilege, so I'm going to direct my client not to answer that question..

Q. Following this round table meeting, did you

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

-----------------------------------------------------------------------------------------

contact Mr. Batsch to see if he had interest in joining in the Wasserman FastLife investigation?

A. I mean, we were in regular contact on this other case, so we could have talked about it. And when he said, yeah, I'll write up something and get it opened at the State Attorneys office.

Q. So did you have further conversations with Mr. Batsch after the round table meeting to try to induce him to become involved in the Wasserman FastLife Investigation?

A. I wouldn't say induced. I was pitching him and see if he would join in because of the avenue of the tax liens and civil judgments and investments and stuff like that.

Q. You wanted him to join -- you wanted to get the Federal Government involved?

A. Not me personally, it was more of what I

I don't recall if other people will remember, but that's mostly what would have happened.

Q. You had been working with Mr. Batsch on your other case, the unidentified case for several months prior to the round table?

A. And the FBI agents, yes.

Q. And during that time you didn't mention the Wasserman FastLife situation to Mr. Batsch?

A. No, I don't think so. Not until later on, I think, if I remember directly toward the end of 2018 probably.

Q. I'm trying to clarify, was the round table meeting the first time you had mentioned the Wasserman FastLife investigation to Mr. Batsch?

A. Yeah, most likely, it would have been around the end of 2018 that I had spoken with Mr. Batsch and FBI to see what their -- gauge their interest on it.

Q. So after the round table meeting and I think you said you may have talked about the Wasserman FastLife situation for maybe five minutes?

A. Yeah.

Q. So after the meeting did Mr. Batsch or same day or next few days come up to you and say, hey, this Wasserman FastLife thing sounds interesting,

Page 162

tell me more?

A. Yeah, probably. Well, I'm saying, like, I don't know the specific details on how the case got from me to Shawn and to the fact that you're saying that, you know, in a couple days. I don't know the time frame of it, I just know that I had a case, I told Shawn about it and the FBI agents and then Shawn was interested in it, essentially, and so they moved forward in early 2019.

Q. Well, that's what I'm trying to find out, because as a result of what you said at the meeting, did he -- let me finish the question, please. Did he initiate contact with you, hey, tell me more about

TRULINCS 73653018 - WASSERMAN, PHILLIP ROY - Unit: COL-B-B

--------------------------------------------------------------------------------

this or did you initiate contact with him, hey, you know I want to tell you more about this, maybe this is something?

A. I have no idea.

Q. Who picked up the ball after the round table meeting?

A. I have no idea what happened after that, like how it went, either he contacted or I contacted him, I don't recall exactly how that went.

Q. And in your conversations within a relatively short time frame after the round table meeting, did you provide information to Mr. Batsch