**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

PHILLIP R. WASSERMAN,

     Plaintiff,

v.                                            Case No. 8:21-cv-2334-TPB-SPF

UNITED STATES OF AMERICA,
STEPHEN HOWLAND, and STATE OF
FLORIDA OFFICE OF FINANCIAL
REGULATION,

     Defendants.

_____/

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This matter is before the Court on cross-motions for summary judgment, all of which were filed on December 13, 2024, by Defendants Stephen Howland, Defendant the State of Florida Office of Financial Regulation, Defendant United States of America, and Plaintiff Phillip R. Wasserman.  (Docs. 77; 78; 79; 81).  Responses to those motions were timely filed (Docs. 92; 94; 95; 97), as were replies to those responses (Docs. 102; 103; 104; 105).  The Court also requested and received supplemental briefing from Defendant United States of America and Wasserman.  (Doc. 117; 123; 124).  After reviewing the motions, responses, replies, additional briefing, the court file, and the record, the Court finds as follows:

**EXHIBIT D  001**

## Background

Plaintiff Phillip R. Wasserman, a former member of the Florida Bar, is currently serving a 180-month federal prison sentence for fraud and tax evasion.[1] After a thirty-day criminal jury trial, where he represented himself, Wasserman was convicted on one count of conspiracy and on numerous counts of wire fraud and mail fraud. He subsequently pled guilty to tax evasion charges. *See United States v. Wasserman*, 8:20-cr-00207-CEH-NHA (M.D. Fla. Feb 1, 2024) (Docs. 992; 1005; 1019). Even before he was convicted and sentenced to prison, Wasserman filed this civil action against some of the governmental enforcement entities and individuals that worked on the criminal case against him.

Wasserman's criminal charges arose from his fraudulent activities in connection with FastLife, a life insurance brokerage firm that he started in 2016 with his criminal co-defendant, Kenneth Rossman. To get FastLife off the ground, Wasserman and Rossman obtained funds from numerous investors – many of whom were senior citizens with whom Wasserman and Rossman had no prior relationship. The investors loaned money to the company through promissory notes with varied interest rates, and many were persuaded to liquidate traditional investments such as annuities to do so. But Wasserman and Rossman failed to disclose to investors the potentially negative personal tax consequences resulting from such liquidations, among other things.

---

[1] The Florida Bar's official website indicates Plaintiff is "not eligible to practice law in Florida," apparently as a result of a "disciplinary resignation." Member Profile: Phillip R. Wasserman, Fla. Bar, https://www.floridabar.org/directories/find-mbr/profile/?num=486388 (last visited Sep. 4, 2025).

**EXHIBIT D  002**

In 2018, the State of Florida Office of Financial Regulation (the "OFR") began investigating Wasserman and FastLife for fraud after they received a tip from state officials in Alabama.  Defendant Stephen Howland was assigned as the investigator to oversee the case for the OFR.  In reviewing public court records, Howland discovered several federal tax liens and adverse civil judgments against Wasserman.  He also obtained information as to Wasserman's compensation and expenditures through subpoenas issued by the OFR.

Howland then began interviewing FastLife investors and inquired about: (1) Wasserman having any tax liens or civil judgments entered against him, (2) whether they believed it would have been material for them to know about the liens and judgments before investing with FastLife, and (3) whether they would still have invested if they had known about the liens and judgments.  Howland further asked the investors about their knowledge of Wasserman's compensation agreement, as well as whether they were aware of how FastLife's funds were being spent.

In 2019, the United States, led by IRS Special Agent Shawn Batsch, joined the OFR's investigation to review potential federal tax, fraud, and conspiracy violations.  Batsch and his team began conducting joint interviews of FastLife investors with Howland, inquiring about the tax liens and judgments, Wasserman's obligations to investors, Wasserman's comingling of business and personal funds, Wasserman's lack of bookkeeping and tracking for investment funds, as well as asking if any of these facts would have changed their minds about investing.  The

**EXHIBIT D  003**

investigation resulted in a federal criminal indictment, jury trial, conviction and Wasserman's 180-month prison sentence.

Before his criminal trial, however, Wasserman filed the instant action alleging that in the course of interviewing witnesses as part of their investigation, Batsch and Howland improperly disclosed information related to Wasserman's tax liens and judgments, compensation and authority over FastLife affairs, personal expenditures and debts, FastLife's bookkeeping, and evidence that he was commingling business and personal accounts. *See* (Doc. 21). He alleges that these disclosures violated 26 U.S.C. § 6103, a federal statute that imposes liability for unlawfully disclosing taxpayer return information. Wasserman seeks damages in the amount of at least $1,000 per disclosure, in addition to punitive damages for the alleged disclosures.[2]

Each Defendant answered the amended complaint and asserted several affirmative defenses. *See* (Docs. 23; 41; 42). Following discovery and a failed mediation conference in November 2024, the parties filed their respective motions for summary judgment.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary

---

[2] While Wasserman brings a total of 70 counts against Defendants for improper disclosures of return information, they are premised on the same factual background – Wasserman separates these counts based on the recipient and subject matter of the disclosure.

EXHIBIT D  004

judgment is only defeated by the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary judgment. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)).

**EXHIBIT D  005**

## Analysis

The thrust of Wasserman's lawsuit is that Defendants disseminated protected "return information" in the course of their successful criminal investigation of him, by asking investor-victims "deftly worded questions that transmitted protected information as transparently as if made in an affirmative statement" in violation of 26 U.S.C. § 6103.[3]  Defendants respond by asserting that their disclosures are excepted from the general rule against disclosures of "return information," and that they are otherwise not liable for § 6103 violations.  The Court will first consider Wasserman's claims against the United States and then his claims against the OFR and Howland.[4]

### *Claims Against the United States*

Prohibition on Disclosing "Return Information" – 26 U.S.C. §§ 6103, 7431

Section 6103 of the Internal Revenue Code prohibits officers and employees of the United States from "disclos[ing] any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section."  26 U.S.C. § 6103(a); *Church of Scientology of California v. I.R.S.*, 484 U.S. 9, 10 (1987) ("26 U.S.C. § 6103, lays down a general rule that 'returns' and 'return information' as defined therein shall

---

[3] Wasserman gives examples of these types of questions, such as: "Did you know that Mr. Wasserman paid himself more than $500,000 per year from monies that FASTLIFE received from investors?" or "Had you known that Mr. Wasserman had paid himself more than $500,000 per year from monies that FASTLIFE received from investors, would you have invested in FASTLIFE?"

[4] Wasserman's motion for summary judgment seeks a ruling that Defendants violated 26 U.S.C. § 6103.  That motion is denied for the reasons stated in this Order.

EXHIBIT D  006

be confidential."). "Return information," for purposes of Title 26, is defined in

relevant part as:

> The term "return information" means . . . taxpayer's identity, the
> nature, source, or amount of his income, payments, receipts,
> deductions, exemptions, credits, assets, liabilities, net worth, tax
> liability, tax withheld, deficiencies, overassessments, or tax payments,
> whether the taxpayer's return was, is being, or will be examined or
> subject to other investigation or processing, or any other data, received
> by, recorded by, prepared by, furnished to, or collected by the Secretary
> with respect to a return or with respect to the determination of the
> existence, or possible existence, of liability (or the amount thereof) of
> any person under this title for any tax, penalty, interest, fine,
> forfeiture, or other imposition, or offense . . . .

26 U.S.C. § 6103(b)(2)(A); *see Ryan v. United States*, 74 F.3d 1161, 1163 (11th Cir.

1996) ("[T]he statutory definition of 'return information' confines it to information

that has passed through the IRS.").

Under 26 U.S.C. § 7431, injured taxpayers may sue the United States or

other persons for damages stemming from violations of § 6103. *See* 26 U.S.C. §

7431(a). Section 7431 provides that a defendant may be liable to a plaintiff for

$1,000 for each unauthorized disclosure, or the actual damage sustained by the

plaintiff, whichever is greater. *See* 26 U.S.C. § 7431(c). Wasserman, having been

convicted of conspiracy, mail fraud, and wire fraud, and having pled guilty to tax

evasion, bases this civil action on these provisions.

The "Investigative Exception" to § 6103

Throughout § 6103, there are several exceptions to the general prohibition on

the disclosure of return information. Relevant here, § 6103(k)(6) provides an

exception to liability for IRS officers and employees who disclose return information

**EXHIBIT D  007**

"in connection with [their] official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws" if such disclosure "is necessary [to] obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title."

A "necessary disclosure" of return information is one "which an internal revenue . . . employee, based on the facts and circumstances, at the time of the disclosure, reasonably believes is necessary to obtain information to perform properly the official duties described by this section, or to accomplish properly the activities connected with carrying out those official duties." 26 C.F.R. § 301.6103(k)(6)-1(c)(1). "The term necessary in this context does not mean essential or indispensable, but rather appropriate and helpful in obtaining the information sought." *Id.*

The United States concedes that questions posed to witnesses by Agent Batsch and his team disclosed return information relating to Wasserman, but argues the disclosures were within the investigative exception of § 6103(k)(6). The United States argues that the disclosures were reasonably necessary to obtain information not otherwise available with respect Wasserman's potential participation in a mail or wire fraud scheme, which the Government was investigating as part of a combined investigation into whether Wasserman violated tax laws and other, related financial laws.

**EXHIBIT D  008**

Wasserman responds that the United States could have obtained or tried to obtain the same information from other sources or in other ways (such as by asking Wasserman himself). But nothing in the statute or related regulations requires that the United States conduct its investigations in a particular way or pursue lines of inquiry in a particular order. *See* 26 C.F. R. § 301.6103(k)(6)-1(c)(1) (explaining that "necessary in this context [does not] refer to the necessity of conducting an investigation or the appropriateness of the means or methods chosen to conduct the investigation"); 26 C.F.R. 301.6103(k)(6)-1(c)(3) (explaining that the requirement that the information sought be "not otherwise reasonably available" does not "require or create the presumption or expectation that an internal revenue . . . employee must seek information from a taxpayer or authorized representative prior to contacting a third party witness in an investigation"). Moreover, these witnesses were obviously the best if not only source of information on what they were told or not told by Wasserman and what they relied on when they invested with him.

Wasserman argues that the information sought by the United States regarding the knowledge and reliance of the investors on Wasserman's representations (or non-disclosures) related only to Wasserman's potential criminal liability for mail and wire fraud and not to any tax liability or violation of tax laws. It is true that the investigative exception refers to information sought for purposes of enforcing Title 26 and does not expressly refer to the mail or wire fraud statutes, which are in Title 18. However, as the United States points out, tax liability and tax violations are not unrelated, because individuals do not typically report income

**EXHIBIT D  009**

obtained by fraud. Therefore, an individual's participation in a fraudulent scheme will often implicate or lead to evidence of tax violations, and vice versa. Thus, the same evidence is often relevant to both fraud and tax liability. *See* (Doc. 117-1 at ¶¶ 4, 9, 12-14).

In fact, the criminal indictment against Wasserman resulting from the United States' investigation itself shows the close connection between the fraudulent scheme and tax violations. The indictment charges that Wasserman conspired to cause false tax returns to be prepared for investors to conceal from investors and from the IRS the tax consequences of the investors' liquidation of other investments or borrowing of funds in order to invest in Wasserman's "fraudulent insurance venture." *See United States v. Wasserman*, No. 8:20-cr-207-CEH-NHA (Doc. 69 at 9-10, Count One, ¶ 11m). Accordingly, while Batsch's questions most directly implicated Wasserman's defrauding of investors, exploration of his fraudulent scheme could also be expected to turn up information relevant to tax violations and therefore comes within the protection of § 6103(k)(6).

Even if this reading of the statute were deemed to be incorrect, it is supported by the relevant regulations and the IRS agents' manual. Batsch's conduct therefore comes within the good faith provision for disclosures of return information set forth in 26 U.S.C. § 7431(b), which provides: "No liability shall arise under this section with respect to any inspection or disclosure . . . which results from a good faith, but erroneous, interpretation of section 6103, or [] which is requested by the taxpayer." Under this provision, a plaintiff cannot recover

**EXHIBIT D  010**

damages based on a disclosure of return information "where (1) the agent or agents who disclosed tax return information in violation of § 6103 followed the relevant agency regulations and/or manuals, and (2) the regulations and/or manuals constituted a reasonable interpretation of the law." *Taylor v. Pekerol*, 624 F. App'x 691, 695 (11th Cir. 2015) (emphasis omitted) (quoting *Comyns v. United States*, 155 F. Supp. 2d 1344, 1350 (S.D. Fla. 2001), *aff'd* 287 F.3d 1034 (11th Cir. 2002) (per curiam).

Here, the agency regulation interpreting the investigative exception in 26 U.S.C. § 6103(k)(6) provides that disclosure of return information is permitted, among other things to "establish[] or verify[] misconduct (or possible misconduct) or other activity proscribed by the internal revenue laws *or related statutes*." 26 C.F.R. § 301.6103(k)(6)-1(a)(1)(iv) (emphasis supplied). Thus, under the regulation, disclosures are permitted to obtain not only information relevant to issues of tax liability or offenses under Title 26, but also information relevant to issues under "related statutes." Such related statutes include the mail and wire fraud statutes, among others.[5] Additionally, as noted above, the regulation provides that "[t]he term necessary in this context does not mean essential or indispensable, but rather appropriate and helpful in obtaining the information sought." 26 C.F.R. §

---

[5] The Internal Revenue Manual ("I.R.M.") provides that IRS criminal investigation agents are authorized "to investigate and enforce criminal provisions of the internal revenue laws and other laws for which the Secretary of the Treasury has delegated investigative authority." *See* I.R.M. 9.1.2.2(1) (citing 26 U.S.C. § 7608). Such "other laws" include wire fraud, mail fraud, and making false statements. *See* I.R.M. 9.1.3-1 (listing statutes within the IRS's criminal investigative authority).

**EXHIBIT D  011**

301.6103(k)(6)-1(c)(1). "Nor does necessary in this context refer to the necessity of conducting an investigation or the appropriateness of the means or methods chosen to conduct the investigation." *Id.*

Under these provisions, Batsch's disclosure of return information to elicit information relevant to a fraudulent scheme that involved potential tax issues and violations comes within the § 6103(k)(6) investigative exception when read in light of the foregoing regulations. The Court further finds that both of these regulatory provisions constitute reasonable readings of the statute given the statutory language and the intertwined nature of these crimes and the evidence typically involved. Accordingly, as Batsch and his team acted consistently with these regulations in disclosing information, the United States is protected by the good faith provision.

Wasserman contends that the investigation exception and good faith provision do not shield the United States agents from liability for revealing to witnesses the criminal nature of the investigation by the way they introduced themselves. Wasserman attaches a transcript from one such interview to his initial complaint. *See* (Doc. 1-1). But, in the Court's view, the approach followed by Batsch and his team complied with the manual.

The interview transcript Wasserman points to shows that the IRS agent began by stating, "I'm Special Agent [], criminal investigation. There is an ongoing investigation into Phillip Wasserman."[6] This tracks the instructions in the IRS

---

[6] Wasserman does not point to any evidence that Batsch or other IRS agents departed from this approach to their introduction in other interviews.

**EXHIBIT D 012**

manual.  The Internal Revenue Manual provides that "[s]pecial agents are authorized to display their badges and credentials, make an affirmative statement that they are special agents with the IRS CI [i.e, "Criminal Investigation"] and identify the person under investigation."  I.R.M. § § 9.4.5.11.3.1.4(1) (2019).  What is prohibited by the manual is an affirmative statement characterizing the investigation as criminal in nature, unless the statement is necessary to obtain information.  *Id.*  Batsch and his team made no such affirmative statements.  This is a fine line, of course, as a witness might well conclude from the agent's affiliation with criminal investigations that the investigation the agent is pursuing is criminal.  But that is the line drawn in the agent's manual, approved by the Eleventh Circuit in *Comyns*, 287 F.3d at 1034 (approving *Comyns*, 155 F. Supp. 2d at 1351-52), and followed by agent Batsch in his investigation.

Wasserman urges that agents should have begun questioning the investors on other matters first, so that they could have ascertained whether disseminating information regarding the nature of the investigation was necessary.  Wasserman relies on *Barrett v. United States*, 51 F.3d 475 (5th Cir. 1995), but *Barrett* concerned form letters sent out by investigators in a mass mailing, as opposed to targeted disclosures or interviews.  *See Barrett,* 51 F.3d at 477-80.  The court in *Comyns* distinguished *Barrett* on that basis and approved disclosures similar to those at issue here.  *See Comyns*, 155 F. Supp. 2d at 1351-52.

In view of the record as a whole as it pertains to the investigation of Wasserman, the tax issues and fraud issues were sufficiently intertwined so as to

**EXHIBIT D  013**

justify overlap in the investigation and the questions asked pursuant thereto.

Thus, to the extent "return information" was disclosed in the course of investigating

non-tax matters, the IRS criminal investigators had at least a good faith basis to

believe doing so was permissible because evidence concerning the scheme to defraud

could lead to information related to Wasserman's tax liability or violation of tax

laws. The Court therefore grants summary judgment to the United States as to the

claims brought against it.[7]

### *Claims Against the OFR and Howland*

As an initial matter, the plain language of the investigative exception in §

6103(k)(6) makes clear that it only applies to IRS officers and other *federal* tax

officials. *See* 26 U.S.C. § 6103(k)(6) (stating that the provision applies to "[a]n

internal revenue officer or employee and an officer or employee of the Office of

Treasury Inspector General for Tax Administration"). As a result, Howland and the

OFR cannot rely on that exception.

Claims Against the OFR

For its part, the OFR offers two primary arguments for why it should not be

liable under § 6103. First, it argues that that state agencies are not "persons" for

Title 26 purposes and therefore cannot be held liable under § 7431 for alleged

violations of § 6103, because those sections impose liability only on "persons."

---

[7] Wasserman's response to the United States' motion for summary judgment attaches a 17-page document containing purported evidentiary objections Batsch's declaration filed by the United States. (Doc. 94-3). Wasserman's filing consists for the most part of additional argument on the summary judgment issues. To the extent that the document is a motion to strike the Batch declaration, it is denied.

**EXHIBIT D  014**

Second, the OFR asserts that Eleventh Amendment sovereign immunity shields it from Wasserman's claims.

Concerning the first argument, the Court agrees with the OFR. The applicable definition of "person" for Title 26 purposes is set forth in 26 U.S.C. § 7701(a)(1) and reads as follows: "The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." Nowhere among the various entities in the definition does the term "agency" appear, and it is not otherwise apparent why a state agency would naturally be included in the definition of "person." Other courts have arrived at the same conclusion. *See, e.g., Marsoun v. United States*, 525 F. Supp. 2d 206, 213 (D.D.C. 2007) ("[S]ection 7431(a)(2) does not authorize a right of action against a State, its agencies, or state employees sued in their official capacities (the latter, of course, being no different than a suit against the state)."); *Long v. United States*, 972 F.2d 1174, 1177 (10th Cir. 1992) ("[Sections] 7431(a)(2) and 6103(a) . . . impose liability on 'persons,' 'officers,' or 'employees' who disclose information 'in connection with [their] service as such an officer or employee.' Those terms do not contemplate liability against a state agency."). Consequently, Wasserman's claims against the OFR fail as a matter of law.

Second, the Eleventh Amendment shields state agencies such as the OFR from suit in federal court. This is because "[s]uits against state agencies seeking monetary damages are considered as suits against the state itself." *Brewer v. Purvis*, 816 F. Supp. 1560, 1569 (M.D. Ga. 1993) (citing *Emps. of Dep't of Pub.*

**EXHIBIT D 015**

*Health & Welfare, Missouri v. Dep't of Pub. Health & Welfare, Missouri*, 411 U.S. 279 (1973)). And absent its consent, a state may not be sued in federal court unless Congress has specifically, clearly, and unequivocally expressed its intent to abrogate Eleventh Amendment immunity in the statute itself. *See, e.g., Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,* 601 U.S. 42, 49 (2024); *Monroe v. Fort Valley State Univ.*, 93 F.4th 1269, 1276 (11th Cir. 2024). There is no evidence, let alone clear evidence, of a statutory abrogation of Eleventh Amendment immunity. *See Davis v. California*, 734 F. App'x 560, 563-64 (10th Cir. 2018) (holding that Congress has not abrogated Eleventh Amendment immunity for claims against states or state agencies for violations of § 6103).[8] To the contrary, as discussed above, the statutory language precludes claims against the OFR. Wasserman's claims against the OFR are therefore barred.

Accordingly, in light of the limiting definition of "person" under the relevant statutory language and Eleventh Amendment immunity, the Court dismisses Wasserman's claims against the OFR.

---

[8] In Wasserman's response to Howland's and the OFR's motion for summary judgment (Doc. 95), he fails to respond to the substance of their arguments concerning sovereign immunity; instead, he merely contends that "both Defendants have waived any immunity they might have had by admitting in Response to Request for Admission Number 2 that they violated Section 6103." But as Defendants' later-filed motion to amend (Doc. 100) demonstrates, the admission was a clerical error. To that end, the Court grants the Defendants' motion to amend. *See, e.g., Collier v. Geico General Ins. Co.*, No. 6:20-cv-1208, 2021 WL 3668351, at *3 (M.D. Fla. July 26, 2021) ("[T]he law has a strong preference to resolve cases on their merits, rather than on technicalities.") (quotation omitted).

EXHIBIT D 016

Claims Against Howland

To the extent the Wasserman asserts claims against Howland "in his official capacity," they likewise fail. *See Marsoun*, 525 F. Supp. at 213 ("[S]ection 7431(a)(2) does not authorize a right of action against a State, its agencies, or *state employees sued in their official capacities . . . .*") (emphasis added).

To the extent Wasserman's claims are against Howland individually, the Court again turns to the definition of "return information," quoted above, which is broad but not unlimited. *See* 26 U.S.C. § 6103(b)(3). The plain language of the statute makes clear that, to constitute "return information" for purposes of § 6103 (and any associated liability under § 7431), the information disclosed by Howland must have been in some way received, prepared, or collected "by the Secretary," i.e., by the Secretary of the Treasury or his delegate, the IRS, not by the OFR or its employees.[9] *See Ryan*, 74 F.3d at 1163 (holding that return information is confined to "information that has passed through the IRS"); *see also* 26 U.S.C. § 6103(a)(2) ("[N]o officer or employee of any State . . . *who has or had access to returns or return information . . .* shall disclose any return or return information[.]") (emphasis added).

Thus, the mere fact that the OFR may have independently obtained some of the same information as the IRS does not mean the OFR possessed or disclosed "return information" for purposes of § 6103(b)(3), so long as it did not rely on

---

[9] The term "Secretary" means the Secretary of the Treasury or his delegate. 26 U.S.C. § 7701(a)(11)(B).

**EXHIBIT D 017**

information from the IRS or have access to IRS internal documents.  *See Ryan*, 74 F.3d at 1163 n.3 ("If a prosecutor learns of a business relationship from witnesses, the fact that this information also appears in a tax return does not make the prosecutor's knowledge 'return information.'").

Here, Howland has stated in his deposition and his affidavit that the information he gathered in the course of the OFR's investigation was obtained through public record and docket searches, as well as by subpoenas, through which the OFR obtained a copy of Wasserman's compensation agreement and additional information pertaining to personal expenditures, bank accounts, and the bookkeeping/business practices for FastLife.  *See* (Docs. 77-2; 81-2 at 33-35, 39-40, 58, 62, 80-81, 97-99, 204).  Furthermore, as noted above, Howland's affidavit explains that he did not rely on internal documents prepared or collected by the IRS, nor did he have access to or use Wasserman's return information itself.  *See* (Doc. 77-2 at 6).[10]  In light of the evidence submitted by Howland, and in the absence of contrary evidence submitted by Wasserman, the Court grants summary judgment to Defendant Stephen Howland.[11]

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

---

[10] The Court also notes that the parties spend a substantial part of their briefing debating the existence of a "public records" exception to § 6103 based on variant approaches taken by federal circuit courts.  However, the Eleventh Circuit has not decided this issue, and, in any event, the Court need not reach the issue as Defendants are entitled to summary judgment on other grounds.

[11] Howland additionally argues that qualified immunity shields him from liability for Wasserman's claims, but because the Court grants summary judgment on other grounds, it is not necessary to consider this issue.

**EXHIBIT D  018**

1. "Defendants State of Florida Office of Financial Regulation and Stephen Howland's Motion for Summary Judgment" (Doc. 77) is hereby **GRANTED**.

2. The "United States Motion for Summary Judgment" (Doc. 81) is hereby **GRANTED**.

3. Plaintiff Phillip R. Wasserman's motions for summary judgment (Docs. 78; 79) are hereby **DENIED**.

4. "Defendants State of Florida Office of Financial Regulation and Stepehen Howland's Motion to Amend Responses to Plaintiff's Request for Admission" (Doc. 100) is hereby **GRANTED** as set forth herein.

5. The Clerk is **DIRECTED** to enter a final judgment in favor of Defendants the United States of America and Stephen Howland, and against Plaintiff Phillip R. Wasserman, and providing that all claims against the State of Florida Office of Financial Regulation are dismissed.

6. Following the entry of judgment, the Clerk is directed to terminate any pending motions and deadlines and thereafter close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 8th day of September, 2025.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE

Page 19 of 19

**EXHIBIT D  019**